S. JACKSON & SON, INCORPORATED,
Plaintiff–Appellant,

v.

COFFEE, SUGAR & COCOA
EXCHANGE INC., De-
fendant–Appellee.

No. 1102, Docket 93–7912.

United States Court of Appeals,
Second Circuit.

Argued Feb. 8, 1994.

Decided May 17, 1994.

**428**

Richard E. Nathan, New York City, for plaintiff-appellant.

Michael J. Murphy, New York City (Edmund R. Schroeder and Audrey R. Hirsch-

feld, Lord Day & Lord, Barrett Smith, of counsel), for defendant-appellee.

Pat G. Nicolette, Jay L. Witkin and Helen G. Blechman, Commodity Futures Trading Com'n, Washington, DC, for amicus curiae Commodity Futures Trading Com'n.

Before: PRATT, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant S. Jackson & Son, Incorporated appeals from a judgment entered on August 23, 1993 in the United States District Court for the Southern District of New York (Keenan, *J.*) dismissing Jackson's action for declaratory relief, the district court having found that Jackson failed to exhaust its administrative remedies under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–25, and that the action raised issues within the primary jurisdiction of the Commodity Futures Trading Commission ("CFTC").

Because Jackson's complaint presents no case or controversy within the meaning of Article III of the United States Constitution, we affirm the district court's dismissal of the complaint.

## BACKGROUND

Jackson owns and operates warehouse facilities in New Orleans. Defendant-appellee Coffee, Sugar & Cocoa Exchange Inc. ("Exchange") provides a marketplace for the trading of futures contracts in coffee and certain other commodities. Under the rules of the Exchange, coffee delivered under Exchange futures contracts must be stored in warehouses licensed by the Exchange. Since 1985, Jackson has operated at the Port of New Orleans twelve licensed "stores,"[1] five of which were located on wharves.

In order to gain what the rules of the Exchange refer to as a "warehouse license," Jackson executed a "Warehouse Agreement" on a form prescribed by the Exchange. Every December since 1985, Jackson has ap-

---

1. A "store" is "that portion of a licensed warehouse which has been approved by the [Exchange's] Warehouse and License Committee as suitable for the storage of an exchange commodity." Exchange Rules ¶ 255.

plied to have its warehouse license renewed for a one-year period beginning the following April[2] and simultaneously has executed a new Warehouse Agreement. The Warehouse Agreement sets forth the terms and conditions under which Jackson agreed to store coffee owned by members of the Exchange.

According to the Warehouse Agreement, there are two events that would cause Jackson to be liable for "all charges incurred in the transfer of certified Coffee" from one of Jackson's facilities "to another licensed warehouse or store." The first is where cancellation of Jackson's warehouse license "is made at its request." The second is "where the cancellation, revocation or annulment [of the firm's license] is made by the Board [of Managers of the Exchange] for cause, during the period for which its license is granted." Additionally, the Warehouse Agreement provides that Jackson

> "will be subject to and abide by the By-Laws, Rules, Resolutions, Orders and Decision[s]" of the Exchange ... [and] will submit to the Arbitration Committee of the Exchange, any controversy which may arise between it and any member of the Exchange relating to or connected with any matter occurring during the period it holds a warehouse license and to abide by any decision of said Arbitration Committee[.]

On December 18, 1991, the Board of Managers of the Exchange ("Board") adopted Licensing Resolution No. 2 ("Resolution"). The Resolution imposed a moratorium on the licensing of any additional wharf warehouses in the Port of New Orleans and prohibited coffee certified by the Exchange for delivery after December 31, 1991 from being stored in wharf warehouses in New Orleans. However, it permitted certified coffee already stored in currently licensed wharf warehouses to continue to be eligible for delivery. The Resolution was adopted in response to a finding that coffee stored in wharf warehouses at New Orleans and elsewhere was more likely to burst from its bags than coffee stored at inland facilities. The Resolution was approved by the CFTC on April 1, 1992.[3]

On March 11, 1992, the Exchange approved a recommendation of the Exchange Warehouse & License Committee ("Committee") to renew licenses for the storage of coffee already stored in wharf warehouses at New Orleans for a limited period beginning April 1, 1992 and ending December 21, 1992. In January of 1992, Jackson applied to the Board to renew its warehouse license, which was due to expire on March 31, 1992. On March 11, the Board decided to grant the renewal application. However, in accordance with its action to limit the term of licenses for wharf warehouses, the licenses relating to Jackson's five wharf stores were renewed only until December 21, 1992.[4] The Board specifically provided that the licenses would expire after that date and that the coffee stored in the wharf stores would lose its certification for delivery.

Under Exchange Rule 8.10(h), if "coffee must be moved to another licensed store because of the expiration, suspension, or cancellation, for any reason, of the license covering the licensed store within which the coffee was located, the warehouse from which the coffee is to be moved shall be liable to the Member moving such coffee." On October 16, 1992, Walter J. Hines, an Executive Senior Vice-President of the Exchange, wrote to Jackson, "reminding" the firm of this rule and stating that he expected the Exchange member/owners to invoke it. Jackson then sent a letter dated November 18, 1992 to both the Exchange and the member/owners that had coffee stored in its wharf facilities, indicating that the member/owners would have to pay the costs of moving the coffee to a licensed store. In response to the Jackson letter, a letter from Elizabeth R. Clancy, Senior Vice-President-General Counsel of the Exchange, was sent to Jackson on No-

---

**2.** Each license granted by the Exchange expires on March 31 of each year unless the Exchange provides otherwise. Exchange Rule 5.16.

**3.** During the notice and public comment period afforded by the CFTC on the Resolution, Jackson wrote three letters to the CFTC opposing the Resolution and its implementation.

**4.** The Board renewed the licenses for Jackson's inland facilities through March 31, 1993.

vember 25, 1992. In the letter, Clancy opined that, pursuant to the provisions of Rule 8.10(h), any costs arising from moving the coffee from the wharf stores would be Jackson's responsibility.

Upon the December 1992 expiration of the licenses, Exchange members owning coffee in Jackson's wharf stores began to move the coffee to other licensed facilities. By early 1993, a dispute had arisen between Jackson and J. Aron & Co., a member/owner that had stored coffee in Jackson's wharf stores, regarding who would pay the moving costs. Jackson, relying on the provision in the Warehouse Agreement that imposed the costs of moving coffee on Jackson only in the event that "cancellation, revocation or annulment" of the warehouse license was "for cause," contended that the moving costs were not its responsibility. Aron, relying on Rule 8.10(h), subscribed to the opposite view. The parties could not resolve the dispute and Aron demanded arbitration pursuant to the terms of the Warehouse Agreement and Exchange Rules.

During the midst of its dispute with Aron, Jackson, in January of 1993, commenced the action against the Exchange that gives rise to this appeal. Jackson sought a declaration from the district court that (1) the Board's actions limiting the length of the wharf stores' licenses violated Exchange Rules approved by the CFTC and the contract between Jackson and the Exchange; (2) the statements made in the two letters were inconsistent with the Exchange Rules and had no basis in the contract; (3) the March 11, 1992 decision not to renew the wharf store licenses for the full term was invalid because it had not been submitted to the CFTC; (4) the March 11 action of the Exchange was unenforceable because it violated the good faith requirements imposed by the CFTC; and (5) the actions of the Exchange violated due process. Significantly, Jackson's complaint included no prayer for coercive relief against the Exchange; specifically, there was no request to restore approval for Jackson's wharf facilities, nor was there any claim for monetary or other injunctive relief. On March 11, 1993, the Exchange moved to dismiss the complaint on the basis of Jack-

son's failure to exhaust its administrative remedies or, alternatively, on the basis of the doctrine of primary jurisdiction.

On August 16, 1993, the district court dismissed the complaint in its entirety, finding that the exhaustion of remedies doctrine applied because the CEA and the rules of the CFTC "expressly provide for review of the Exchange's March 11, 1992 licensing action," and that requiring Jackson to "exhaust the review procedures of the CFTC is consistent with congressional intent in implementing the CEA." As an alternate ground for dismissal, the district court relied on the doctrine of primary jurisdiction, noting that the gravamen of Jackson's claims centered on the propriety of the Exchange's actions under its own rules and, therefore, that these claims properly should be considered first by the CFTC. The district court also dismissed Jackson's due process claims, finding that the Exchange is not an agency of the United States and that its conduct does not constitute state action.

Aron commenced the arbitration proceeding against Jackson in April of 1993, while this case was pending in the district court. Aron sought to compel Jackson to bear the costs of moving the coffee. On May 12, 1993, Jackson answered and asserted counterclaims in the arbitration proceeding that raised the identical issues presented by its complaint in this case. On October 7, 1993, having filed its appeal from the district court's order, Jackson sought from this Court a stay of arbitration pending final judgment in this case. On November 2, 1993, we denied that application from the bench.

## DISCUSSION

We note at the outset that neither the parties nor the district court *sua sponte* addressed the issue of subject matter jurisdiction in the proceedings below. The Exchange raises the issue for the first time on appeal. It is axiomatic that "in our federal system of limited jurisdiction any party or the court sua sponte, at any stage of the proceedings, may raise the question of whether the court has subject matter jurisdiction." *Manway Constr. Co. v. Housing*

*Auth. of the City of Hartford,* 711 F.2d 501, 503 (2d Cir.1983). If a federal court lacks subject matter jurisdiction over an action, that action must be dismissed. Fed.R.Civ.P. 12(h)(3). Because we conclude that the district court had no subject matter jurisdiction, we affirm the dismissal of Jackson's complaint.

■ Article III of the United States Constitution limits the judicial authority of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Because Article III is a limit on judicial power, a court will not have subject matter jurisdiction over an action absent the requisite case or controversy. *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am.,* ─── U.S. ───, ───, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993); *In re Joint E. & So. Dist. Asbestos Litig. (In re Keene Corp.),* 14 F.3d 726, 730 (2d Cir.1993). A federal court may only be called upon "to adjudge the legal rights of litigants in actual controversies," *Liverpool, N.Y. & Phila. S.S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885); accordingly, a necessary prerequisite to the exercise of judicial power is the presence of a "claim of substantive right" that triggers the adjudicative function of the court, *Keene Corp.,* 14 F.3d at 730–31 (citing *Tutun v. United States,* 270 U.S. 568, 577, 46 S.Ct. 425, 426, 70 L.Ed. 738 (1926)). In other words, in order to achieve the status of a case or controversy, a dispute must exist between two parties having adverse legal interests. *Aetna Life Insur. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

■ In this case, Jackson seeks a declaration that, among other things, determines that the setting of selective expiration dates for the licenses of particular stores (specifically, wharf stores) was inconsistent with Exchange Rules and in violation of Jackson's contract with the Exchange; that the opinions the Exchange officials expressed in the letters were inconsistent with Exchange Rules; and that the decision of the Board regarding the moving of coffee from wharf warehouses was not approved by the CFTC and, therefore, that any Exchange bylaws, rules, regulations or decisions resulting from that decision were not part of the contract between Jackson and the Exchange. However, a mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950). In *Keene Corp.,* we recognized that "the statute [28 U.S.C. § 2201] authorizing the declaratory judgment remedy explicitly incorporates the Article III case or controversy limitation.... [It] does [not] provide an independent cause of action." 14 F.3d at 731. Thus, where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed." *Browning Debenture Holders' Comm. v. Dasa Corp.,* 524 F.2d 811, 817 (2d Cir.1975).

■ It is apparent that the declaratory relief sought by Jackson does not carry any implications for practical enforcement upon the parties. In fact, both in its brief and during oral arguments, Jackson did not challenge the authority of the Exchange to direct that the use of wharf facilities for the storage of coffee be discontinued. Specifically, Jackson stated that "[it] ... recognized that ... a decision not to use wharf facilities for the future storage of coffee was a decision the Exchange was entitled to make." Moreover, Jackson asserted that it did not "believe there was any good-faith basis on which it might seek review of that decision, either before the CFTC or otherwise." Conceding that the Exchange was entitled to make a decision declaring a moratorium on storage at wharf facilities, Jackson proceeds to challenge the manner in which the decision is to be implemented.

In light of the fact that Jackson neither seeks restoration of its wharf facilities to approved status nor any other form of relief against the Exchange, a declaration favorable to Jackson would be just that and nothing more. No dispute between the parties would be resolved. If Jackson were to prevail in this action, it would not be entitled to any relief against the Exchange; conversely, a declaration in favor of the Exchange would

not broaden or narrow any of its rights in relation to Jackson. *Cf. United States Nat'l Bank,* — U.S. at —, 113 S.Ct. at 2178 (" 'valuable legal rights [must] be directly affected to a specific and substantial degree'" (quoting *Nashville, C. & St. L.R. Co. v. Wallace,* 288 U.S. 249, 262, 53 S.Ct. 345, 347, 77 L.Ed. 730 (1933))); *Aetna Life Ins.,* 300 U.S. at 241, 57 S.Ct. at 464 (controversy between parties must be "real and substantial ... admitting of specific relief through a decree of conclusive character"). Such a declaration seemingly would verge on the status of an advisory opinion, which, of course, no federal court is empowered to deliver. *See Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). Accordingly, Jackson's failure to seek the adjudication of any adverse legal interests between itself and the Exchange is fatal to its complaint in this action.

Our conclusion is supported by Jackson's own recognition of its true focus in this case. In its brief, Jackson adopted the district court's summary of the central issue sought to be resolved by Jackson: "The district court recognized that '[t]he present dispute centers on who should bear the cost of moving coffee from plaintiff's wharf storehouses.'" The gravamen of the complaint is the interaction of Rule 8.10(h) and the "for cause" language of the Warehouse Agreement. The resolution of that issue and the determination of who must pay the moving costs clearly affects only Jackson and Aron and in no way implicates the rights of either the Exchange or Jackson in relation to each other. That controversy properly is the subject of a pending arbitration, pursuant to the terms of the Warehouse Agreement, and is not before us.

This is a dispute between Jackson and Aron, pure and simple. A forum for the resolution of that dispute has been provided, and the federal district court is not that forum. In light of the case or controversy requirement, we cannot permit Jackson to pursue an action in the district court in aid of the relief it properly seeks in the arbitration proceedings. Jackson's contention that the informal statements made by Hines and Clancy in their respective letters interpose

the Exchange into its dispute with Aron, thereby creating a case or controversy with the Exchange, is rejected.

We have considered the other arguments put forth by Jackson and find them to be meritless.

## CONCLUSION

The judgment of the district court dismissing Jackson's complaint is affirmed for the foregoing reasons.